**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-295 (CKK)** |
| **v.** | : | |
| | : | |
| **NEIL ASHCRAFT,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Neil Ashcraft ("Ashcraft") to 90 days in jail, 36 months of supervised release, $2,000 restitution, and the mandatory $50 in special assessments.

**I.       Introduction**

Defendant Neil Ashcraft, a 39-year-old truck driver and former Marine, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Ashcraft pleaded guilty to one count of violating 18 U.S.C. § 641 (Theft of Government Property) and one count of 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted

---

[1] Although the Statement of Offense in this matter, filed on September 19, 2022, (ECF No. 7 at ¶ 3), reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Building or Grounds). As explained herein, a sentence of 90 days in jail, 36 months of supervised release, $2,000 restitution, and the mandatory $50 in special assessments ($25 for each of the two Class A misdemeanors to which he pleaded guilty) is appropriate in this case because Ashcraft: (1) climbed the Inaugural stage scaffolding and used that heightened perch to encourage other rioters; (2) used a knife to destroy government property, specifically white sheeting covering the scaffolding; (3) in destroying that scaffolding, facilitated the riot by enabling rioters to see into and though the scaffolding; (4) entered the Capitol building unlawfully; (5) used a metal pole he found to bang on the floor of the Capitol building and enhance the noise of his chanting; (6) kicked a door, leaving a footprint on it; (7) stole water from a jug that did not belong to him (and likely belonged to the government, not another rioter);[2] (8) stole an American flag and flag pole belonging to the U.S. government; (9) posed for photographs inside the Capitol building; (10) remained inside the Capitol for approximately 41 minutes; and (11) once he realized his vulnerability to the nationwide federal investigation into January 6, he conspired to hide and then burn the stolen flag and dispose of the stolen flag poles in a pond so as to obstruct that federal investigation.

The Court must also consider that Ashcraft's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts of and circumstances of Ashcraft's crime and his destruction of evidence

---

[2] The government has not identified the true owner of the water jugs, but the surrounding circumstances, particularly the jugs' location inside the U.S. Capitol building hallway and the timing of Ashcraft's conversion of the water, makes it more likely than not that the jugs belonged to a government employee, such as a member of Congress, Congressional staff, or the Capitol Police.

support a sentence of 90 days in jail, 36 months of supervised release, $2,000 restitution, and the mandatory $50 in special assessments.

## II.        Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 7 (Statement of Offense), at 1-3.

*Defendant Ashcraft's Role in the January 6, 2021, Attack on the Capitol*

On or about January 5, 2021, Defendant Neil Ashcraft and his wife, Shelley Varney, drove together from their home in Sanford, Florida to Washington D.C. to protest the results of the 2020 presidential election. On January 6, 2021, the defendant, dressed in a black jacket and hat, a tan neck gator, and digital camouflage pants, and Varney were among the crowd of people who gathered near the Washington Monument and the Ellipse for the "Stop the Steal" rally and then walked to the U.S. Capitol grounds via Pennsylvania Avenue.[3] The photograph below was posted on Instagram by another person on January 6, 2021, and depicts how Ashcraft and Varney (outlined in yellow) appeared that day. Ashcraft carried pepper spray in a pants pocket.

---

[3] Varney has been separately charged, also with misdemeanors, in *United States v. Varney*, 1:22-cr-307 (JDB). Varney signed a plea agreement but has not yet been scheduled for sentencing by Judge Bates.



*Photo 1:  Instagram photograph of Ashcraft and Varney on January 6, 2021*

The Peace Circle is due west of the U.S. Capitol building and marks the end of Pennsylvania Avenue, N.W. At approximately 12:55 p.m., rioters overwhelmed a police perimeter stationed near the Peace Circle. Within about a minute, rioters had surged from the Peace Circle into the ground-level plaza to the west of the U.S. Capitol building (the West Plaza). Ashcraft was present near Peace Circle at around the time of the breach and reached the West Plaza minutes after the breach as part of this initial wave of rioters.

With Inauguration Day only two weeks away and the ceremony taking place in its traditional location on the west side of the U.S. Capitol building, the West Plaza was an active construction site as work was well underway to build the Inauguration stage, stands, and

supporting structures. As such, the West Plaza contained scaffolding in multiple locations and a media tower. Those structures were wrapped in white plastic sheathing that served both aesthetic and security purposes. The white sheeting created the appearance of a white pillar, which looked nicer than open scaffolding, and prevented people from seeing *inside* the scaffolding, which in some places obscured unsecured stairs that provided access to the Upper West Terrace and thus the U.S. Capitol building itself.

While on the West Plaza, Ashcraft scaled an exterior wall as well as the scaffolding. Once at the top of the scaffolding, Ashcraft shouted encouragement to the thousands of rioters below him, calling for more of them to flood the West Plaza, where a vastly outnumbered group of police officers were attempting to hold the rioters at bay and prevent them from entering the U.S. Capitol building itself.

 

*Photos 2 and 3:  Photographs of Ashcraft after climbing an exterior wall and scaffolding, respectively, on the West Plaza*

While on the scaffolding, Ashcraft used a knife, which had been handed to him by another rioter, to cut approximately ten to twelve feet of white sheathing away from the scaffolding. The defendant's intent in doing so was to allow other rioters to see inside the scaffolding and to create an area for rioters to hang flags.

After cutting the sheathing away, Ashcraft descended the scaffolding and added his body to the mob at ground level, joining in chants expressing dissatisfaction with the 2020 presidential election. From his vantage point, Ashcraft had a proverbial front row seat to physical clashes between rioters and the police officers attempting to defend the U.S. Capitol. He knew he was not lawfully on the premises. He knew the police wanted him and the other rioters to leave. He knew his presence added strength to the crowd, and thus danger to the officers. He didn't care.

At some point, the mob on the Lower West Plaza overran the outnumbered police officers. While Ashcraft did not personally clash with officers, he took immediate advantage of the efforts of others and followed the mob streaming through the now-broken police line. Ashcraft then climbed exterior stairs to the U.S. Capitol building's Upper West Terrace, an area elevated about two flights above ground level. From there, the defendant walked with other rioters to the Senate Wing Door.

At approximately 2:13 p.m., rioters broke windows next to the Senate Wing Door, entered the U.S. Capitol building, and broke open the Senate Wing Door from inside the building. Ashcraft was right there, watching it happen. He saw rioters banging on the doors. He saw rioters use pieces of wood to smash in the windows. He knew the rioters were breaking into the building illegally. He knew that Congress was inside, working to certify the results of the 2020 presidential election. While he has not admitted it, logic dictates that Ashcraft must have understood that a mob of rioters breaking into the building would disrupt Congress's work. This did not deter him.

Instead, approximately one minute later, at 2:14 p.m., Ashcraft followed the mob and entered the U.S. Capitol building through the now-open Senate Wing Door.



*Photo 4:  Ashcraft (circled in yellow) entering the U.S. Capitol building at 2:14 p.m.[4] through the Senate Wing Door*

Along the way, Ashcraft picked up a white metal pole, which he believed to be part of an event tent, from the ground and carried it inside the U.S. Capitol building. Once inside, he repeatedly struck the pole against the floor, using the loud banging sound it made to punctuate and emphasize his chanting and yelling "Whose house? Our house!"

---

[4] The timestamps on U.S. Capitol CCTV footage are rendered in Coordinated Universal Time (UTC), which was five hours ahead of Eastern time on January 6, 2021.



*Photo 5:  Ashcraft (outlined in yellow) striking the metal pole against the U.S. Capitol building floor*

After entering the building, Ashcraft turned right and walked down a hallway. Along the way, Ashcraft encountered a closed door, which he kicked in an attempt to open. He failed, but he did leave a footprint on the door. Someone in the mob scolded him for kicking the door. In that same hallway, Ashcraft found several five-gallon jugs, none of which belonged to him. He opened one of the jugs and drank the water inside. The hallway led to the Rotunda, which Ashcraft entered.



*Photo 6:  Ashcraft (outlined in yellow), shortly after he entered the Rotunda*

Ashcraft observed uniformed police officers in the Rotunda. They were far outnumbered by the rioters, however. Nevertheless, Ashcraft lingered in the Rotunda for over 20 minutes, at one point posing for a photograph with the Capitol's statue of Ronald Reagan. He also escorted another rioter to the water jugs he had found and helped that rioter use the water inside to rinse his face.[5]



*Photo 7:  Ashcraft in the Rotunda posed in front of a statute of Ronald Reagan (image retrieved from Ashcraft's cell phone)*

Eventually, Ashcraft decided to further explore the U.S. Capitol building. He left the Rotunda and ascended some interior stairs, which led him to another hallway. There, he found an American flag on a flagpole and in a flag stand, all belonging to the U.S. Capitol building, which is administered and maintained by the Architect of the Capitol. Aschraft decided to steal the flag and flagpole. He took the flag off its stand, unscrewed the metal pole to which it was attached, put the two poles together, wrapped the flag around them, and carried it all with him as he continued to explore the U.S. Capitol building.

---

[5] Both the police and rioters used chemical irritants against each other, inside and outside the U.S. Capitol building, throughout January 6, 2021. Video footage reveals that it was common for people affected by chemical irritants to try to mitigate or counter the effects by rinsing their faces.

While roaming the second level of the building, Ashcraft observed police officers with their weapons drawn, pointed down below them. While this caused Ashcraft to alter his route, it did not lead him to exit the U.S. Capitol building. Ashcraft found a window, waved at the crowd outside near the scaffolding where he had entered, and told people "They're going to lock us in here and arrest us."

At approximately 2:36 p.m., Ashcraft returned to the Rotunda and walked around it with the stolen flag draped around his neck and shoulders.



*Photo 8:  Ashcraft in the Rotunda after stealing the flag, walking with it draped around his body*

Ashcraft left the Rotunda (for the second time) at approximately 2:40 p.m., walked back up the stairs, and roamed the 3rd floor of the U.S. Capitol building for approximately another 14 minutes.

Ashcraft finally exited the Capitol building at approximately 2:55 p.m. through the East Rotunda Doors, but not before rolling up the stolen American flag around the stolen flagpoles, which made it easier for him to carry them out of the door.



*Photo 9:  Ashcraft rolling up the stolen American flag around the disassembled flagpole*



*Photo 10:  Ashcraft moving to join the exiting crowd, carrying the rolled-up stolen American flag and flagpole*



*Photo 11:  Ashcraft exiting with the stolen American flag and flagpole*

Ashcraft was aware that the Senate intended to tally the Electoral College votes, and thus certify the 2020 presidential election of Joseph R. Biden, on January 6, 2021, the same day that he entered the U.S. Capitol building and participated in its occupation.

After exiting the building, it took Ashcraft approximately 40 minutes to locate and reunite with his wife, Varney. She introduced him to several members of the Oath Keepers whom she had met, including one of the leaders of the Florida chapter, which Ashcraft had been trying to join. Ashcraft and Varney remained on the Capitol grounds for approximately 30 more minutes, speaking with the Oath Keepers, specifically discussing the next steps Ashcraft needed to follow to join and become active in the Florida chapter, which included downloading and creating a profile on Signal, an encrypted communications application.

The next day, Ashcraft and Varney left Washington, D.C. by car to drive back to their home in Florida, taking the stolen American flag and flagpole with them. On the way, Ashcraft

and Varney contemplated and discussed the gravity of what they had seen and done at the U.S. Capitol the day before. In the days that followed, Ashcraft continued to purse membership in the Florida Oath Keepers, engaging in the specific communications the group directed.

By January 8, 2021, Ashcraft and Varney realized that the FBI was conducting a nationwide search for people who had entered the U.S. Capitol building or committed other crimes on January 6, 2021, and that they were potentially targets of the investigation who could be identified and arrested. Ashcraft and Varney knew that the stolen flag and flagpole were evidence of a crime and did not want the FBI to find it in their possession. Consequently, Ashcraft asked his mother, who lived in a nearby town, to hold the stolen flag and flagpole. Ashcraft's mother initially agreed to do so but called him the next day and told him she was uncomfortable retaining it.  Accordingly, Varney traveled to Ashcraft's mother's house, took possession of the stolen flag, and burned it at Ashcraft's mother's house. She then took the stolen flagpoles and threw them in a pond nearby in Geneva, Florida. Ashcraft knew about Varney's actions, which were intended to destroy evidence, obstruct the FBI's investigation, and hinder any prosecution of Ashcraft and/or Varney.

*Ashcraft's Interview with the FBI*

FBI agents identified Ashcraft as a Capitol riot suspect based on geolocation data showing his cell phone inside the U.S. Capitol building on January 6, 2021, and phone records showing communications on January 6 between Ashcraft and Kelly Meggs, the known leader of the Florida chapter of the Oath Keepers who had participated in some of the most serious and alarming conduct before, during, and after the riot.[6] On April 28, 2021, an FBI Task Force Officer contacted Ashcraft

---

[6] Meggs was separately charged in *United States v. Rhodes III, et al.*, 1:22-cr-15 (APM) ("Oath Keepers I") and convicted of Seditious Conspiracy, in violation of 18 U.S.C. § 2384, among other felonies.

at his home and attempted to interview him. Ashcraft invoked his right to counsel. Approximately seven months later, on December 2, 2021, Ashcraft and Varney—accompanied by counsel—participated in separate voluntary and extensive interviews with FBI agents and Assistant United States Attorneys. Neither had been charged at the time.

Ashcraft was unusually forthcoming during the interview. He described all of the facts above, including conduct (such as kicking the door inside the U.S. Capitol, drinking the water, conspiring to hide/burn the stolen flag, and dispose of the flagpole) that the government did not have captured on video or in photographs. He identified himself in video and photographs. He consented to allow the agents to search his cell phone. He appears to have truthfully answered the questions he was asked about the Oath Keepers and his involvement with them. He expressed remorse for his conduct on January 6, 2021.

Ultimately, Ashcraft agreed to plead guilty via a pre-arrest, pre-indictment plea agreement.

*The Charges and Plea Agreement*

On September 2, 2022, the United States charged Ashcraft by a two-count information with violating 18 U.S.C. § 641 (Theft of Government Property) and one count of 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds). On September 19, 2022, the Court held a combination hearing in which Ashcraft had his initial appearance and pleaded guilty to the Information pursuant to a plea agreement. *See* ECF Nos. 7-10. The Court granted Ashcraft release pending his sentencing. By plea agreement, Ashcraft agreed to pay $2,000 in restitution to the Department of the Treasury. *See* ECF No. 8 at 8.

## III.        Statutory Penalties

Ashcraft now faces sentencing on both the violations of 18 U.S.C. § 641 and 18 U.S.C. § 17524(a)(1)). As noted by the plea agreement and the U.S. Probation Office, Ashcraft faces up to

one year of imprisonment on each count, PSR ¶ 78, and a fine of up to $100,000 per count, *id.* ¶ 97. Ashcraft must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As both offenses are Class A Misdemeanors, the Sentencing Guidelines apply. PSR ¶ 79; 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The PSR includes two errors. First, the PSR does not include a Guidelines analysis for both counts—Counts One and Two—to which the defendant pleaded guilty. *See* PSR ¶¶ 27-37. Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The PSR does not follow these steps. It concludes (*see* PSR ¶ 27) that Counts One and Two group but does not set forth the Guidelines calculation

separated for each count as required under U.S.S.G. § 1B1.1(a)(4).  Second, the PSR asserts that the two offenses be grouped under U.S.S.G. § 3D1.2(b), producing a total offense level of 4.  PSR ¶¶ 27-37, 82.  The parties disagree. As noted in the plea agreement, the two offenses should not group under U.S.S.G. § 3D1.2.  ECF No. 8 at 3.  The two offenses involve different victims—the Architect of the Capitol being the victim of the flag theft and Congress being the victim of the unlawful entry into the building.  Accordingly, the counts should not group and should instead generate an additional two levels, pursuant to U.S.S.G. § 3D1.4(a), which produces a total offense level of 6.  ECF No. 8 at 3.

The parties agree that the appropriate Guidelines calculations are as follows:

Count One: 18 U.S.C. § 641 (Theft of Government Property)

| | | |
|---|---|---|
| U.S.S.G. §2B2.1(a)(2) | Base Offense Level | +6 |
| | Total: | 6 |

Count Two: 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds)

| | | |
|---|---|---|
| U.S.S.G. §2B2.3(a) | Base Offense Level | +4 |
| U.S.S.G. §2B2.3(b)(1)(A) | Restricted Building or Grounds | +2 |
| | Total: | 6 |

Grouping Adjustments

| | | |
|---|---|---|
| U.S.S.G. § 3Dl.2 | *Conviction counts cannot be grouped.* | |
| U.S.S.G. § 3Dl.4 | *Use highest offense level and add units as appropriate.* | |
| | Highest Offense Level | +6 |
| U.S.S.G. § 3Dl.4(a) | Total 2 Units | +2 |
| | Total: | 8 |

| | |
|---|---|
| Acceptance of Responsibility (U.S.S.G. §3E1.1(a)) | -2 |
| **Total Adjusted Offense Level:** | **6** |

*See* ECF No. 8 at 3.

Ultimately, however, it makes no substantive difference whether the Court adopts the parties' or Probation's calculations: both the parties' grouping analysis and Probation's produce a Guidelines sentencing range of 0-6 months of incarceration. Based on a total offense level of either

6 or 4 and a criminal history category of I (based on zero criminal history points), the Guidelines range for both counts is 0-6 months in jail.

## IV.        Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 90 days in jail, 36 months of supervised release, $2,000 restitution, and the mandatory $50 in special assessments.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy. *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Ashcraft's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Ashcraft, the absence of violent or destructive acts is not a mitigating factor. *See* Def.'s Sentencing Mem., ECF No. 19, at 2. Had Ashcraft engaged in such conduct, he would have faced additional criminal charges. On top of Ashcraft's most egregious conduct—stealing the flag and flagpole and

conspiring with his wife to destroy the evidence of his theft—the Court should recognize the significance of Ashcraft helping to cut away the white sheathing on the construction scaffolding. The scaffolding Ashcraft climbed stood on the north end of the west plaza. It was erected in front of the entrance to the exterior stairs. Functionally, the white sheathing not only made the scaffolding more aesthetically pleasing; it also obscured access to the exterior stairs on the northern end of the West Plaza. It is only *after* that sheathing was cut away—by Ashcraft and several others[7]—that rioters (including Ashcraft) gained access to these stairs, which is what enabled rioters to access the Upper West Terrace, then the Senate Wing Door, and ultimately enter the U.S. Capitol building itself.



*Photo 12:  Location of scaffolding Ashcraft climbed, directly in front of the exterior stairs on the northern end of the West Plaza (indicated by the red arrow), and the Senate Wing Door (indicated by the blue arrow)*

---

[7] The government acknowledges that Ashcraft cut away sheathing from the *top* of the scaffolding and that it was the destruction of the sheathing at the *bottom* of the scaffolding that revealed the stairs that allowed rioters to access the Upper West Terrace. That being said, Ashcraft contributed to the destruction of the sheathing and doing so encouraged, and created a permission structure for, other rioters to the same.

The Court should also consider the heightened culpability attached to the timing of Ashcraft's entry into the U.S. Capitol building. Unlike some later-arriving defendants who may argue that they unthinkingly followed the large crowd, assuming they were allowed to enter the U.S. Capitol building because no one stopped them from doing so (as flawed as that logic is), that was not Ashcraft's situation. He witnessed first-hand that the doors were closed and locked. He was present and watched as other rioters used wooden beams to smash the windows on either side of the Senate Wing Door, enter the building by climbing through them, and open the building's doors from the inside. Ashcraft entered the building approximately one minute later. He was part of the initial wave of rioters that quickly overwhelmed law enforcement officers and provided the rioters with nearly unfettered access to the Capitol's chambers, offices, hallways, and other sensitive areas. While Ashcraft did not engage in violence himself, the true strength of the rioters was in the mob's sheer numbers, and he added to that power, contributing to the tip of the proverbial spear.

### B.  Ashcraft's History and Characteristics

Ashcraft has no criminal history, served honorably in the military, and has maintained a steady employment history. However, Ashcraft's military service works both for and against him. He deserves commendation for honorably and voluntarily serving the country. Yet as a former Marine, he, more than most, knew the difficulty of the circumstances that officers were facing as they attempted to defend the Capitol from a mob that outnumbered them and to prevent breaches of the Capitol grounds and building during the certification of the electoral vote count. This makes Ashcraft's choices to commit crimes, particularly against the government as a whole and the nation's leaders and law enforcement in particular, more blameworthy.

The evidence concerning Ashcraft's acceptance of responsibility also cuts in both directions. On one hand, in order to evade arrest and prosecution for his conduct on January 6, he purposefully hid and then destroyed evidence—including burning an American flag, which he, as a former Marine, would be expected to hold sacrosanct and associate with valiant men and women sacrificing their lives to protect the very freedom and rule of law of which he was taking advantage. On the other hand, after being approached by FBI agents and securing the advice of counsel, Ashcraft gave a voluntary full confession, which included volunteering details and criminal conduct, such as the destruction of the flag and flagpoles, about which the FBI was unaware at the time. He then made it as easy as possible for the government to resolve his case; he pleaded guilty to the instant offenses via plea agreement, without having first been charged by complaint and arrested.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188 (RDM), Tr. At 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Ashcraft's actions – before and during the riot – demonstrate the need for specific deterrence. First, in the aftermath of January 6, he recognized the "gravity" of what had occurred but rather than decry extremist and violent political movements, he sought membership in, and involvement with, the Florida chapter of the Oath Keepers, the leader of which, Kelly Meggs, was subsequently convicted of seditious conspiracy in the aftermath of January 6.

Additionally, during Ashcraft's FBI interview, he described entering the Capitol without thinking critically about his actions. He could not (or would not) articulate a reason for entering the building; he claimed that he had no plan or objective. If true, this is more concerning than mitigating.[8] Even taking him at his word, the Court must sentence him in a way that inhibits him from "getting swept up" (as many other defendants have claimed) in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[9] This Court must sentence Ashcraft based on his own conduct and relevant characteristics, but should

---

[8] It is questionable whether Ashcraft's actions were done without thinking.  Some of his behavior indicated forethought – for instance, carrying pepper spray to the Capitol grounds indicates that he anticipated violence at the Capitol and prepared for it.

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Ashcraft has pleaded guilty to one count of violating 18 U.S.C. § 641 (Theft of Government Property) and one count of 18 U.S.C. § 17524(a)(1) (Entering and Remaining in a Restricted Building or Grounds). Both offenses are Class A misdemeanors, to which the Sentencing Guidelines and the sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), apply.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of

sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many

salient differences explain the differing recommendations and sentences. Here, the pool of comparable cases is severely limited.

So far, only 7 defendants convicted of violations of 18 U.S.C. § 641have been sentenced, although there have also been a few cases with other offenses of conviction that involved somewhat similar behavior. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the three cases described below provide the best available comparisons to the relevant sentencing considerations in this case, with one caveat: Ashcraft's conduct was worse than either of them. *See United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006) (In considering disparity, a judge cannot "consider all of the sentences not yet imposed . . . The most a judge can do is consider those other sentences that do exist.").

*United States v. Jason Riddle*, 1:21-cr-304 (DLF) provides a fairly close parallel to this case. On January 6, 2021, Riddle—a former Army and Navy reservist—joined the mob on the west side of the U.S. Capitol building and treated the chaos and disorder around him as an entertaining spectacle, even posing for selfie-style photographs in the middle of the riot. At 2:47 p.m., Riddle entered the building through the Northwest Senate doors (also known as the Parliamentarian's doors) and participated in the ransacking of the Senate Parliamentarian's Office by stealing a bottle of wine from that office, which he drank while watching the destruction, and the Parliamentarian's Senate Procedure book, valued at $254, which he sold outside the Capitol building for $40. Three days later, Riddle gave a live T.V. interview in which he admitted he entered the Capitol, witnessed destruction, drank wine he stole, and did not regret his actions. Six months later, he gave another live T.V. interview in which he expressed no contrition but instead announced he was running for Congress and that his involvement in the riot and the resulting

criminal case would give him valuable publicity. Riddle also destroyed evidence by deleting his social media accounts and some messages, photos, and videos from his phone. Mitigating his conduct, however, Riddle gave a truthful interview to the FBI, pleaded guilty relatively early in his case, and had a relatively minor criminal record. Riddle pleaded guilty to two offenses: theft of government property, in violation of U.S.C. § 641, 40 U.S.C. § 5104(e)(2)(G). The United States recommended a sentence of 90 days' imprisonment, one year of supervised release, 60 hours of community service, and $754 in restitution. Judge Friedrich sentenced Riddle to 90 days' imprisonment on the Section 641 count and three years of probation on the Section 5104(e)(2)(G) offense, while also imposing the requested 60 hours of community service and $754 in restitution.

*United States v. Adam Johnson*, 1:21-cr-648 (RBW), concerns the rioter colloquially known as the "podium guy" or "podium thief." Johnson went towards the Capitol after hearing it had been breached. Outside, he witnessed officers using tear gas and flash bang devices to disperse the crowd and recorded a video of rioters assaulting and disarming police officers. He then entered the U.S. Capitol building at 2:20 p.m., six minutes after Ashcraft, through the same Senate Wing Door, alongside other rioters who were entering through a smashed window. Once inside the building, Johnson roamed all the way to the doors to the House Chamber, spent over ten minutes watching rioters attempting to break down the doors to the House Chamber, at a time he believed members of Congress were still inside counting votes, and encouraged the rioters' efforts by shouting that a bust of George Washington would make "a great battering ram." Johnson also tried to open a door he believed led to Speaker of the House Nancy Pelosi's office and observed rioters pushing against a police line. Most famously, Johnson carried the Speaker's podium to the Rotunda to use as a prop for a photo opportunity, which led to Johnson achieving nationwide notoriety. In total, Johnson spent approximately 35 minutes inside the U.S. Capitol building. Afterward, he

posted on Facebook and exchanged text messages with friends celebrating his actions. When he learned that the FBI was investigating and arresting January 6 rioters, Johnson destroyed evidence by deleting videos and photographs from his cell phone as well as his entire Facebook account. Ultimately Johnson expressed remorse, but only after he had been charged and arrested. Johnson pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1) (unlawfully entering and remaining in a restricted building or grounds). The United States recommended a sentence of 90 days' imprisonment, one year of supervised release, a $5,000 fine, $500 in restitution, and 60 hours of community service. Judge Walton sentenced Johnson to a little less jail time and much more community service: 75 days of incarceration and 200 hours of community service, along with the recommended $5,000 fine and $500 in restitution.

In *United States v. Ryan Suleski*, 1:21-cr-376 (RDM), the defendant pleaded guilty to the same two offenses as Ashcraft, 18 U.S.C. § 641 and 1752(a)(1). Suleski—a former member of the U.S. Army who had received a Bad Conduct discharge—entered the U.S. Capitol building through the Upper West Terrace Door[10] at 2:33 p.m., and did so despite observing and experiencing the police using chemical agents and rubber bullets to keep rioters at bay. While inside, Suleski watched and video recorded as rioters violently attacked the police officers who were blocking the Rotunda doors on the east front of the Capitol and keeping the outside rioters from entering. Suleski then wandered the hallways around the House Gallery with other rioters and attempted to open closed and locked doors, before ultimately rifling through and stealing papers from outside an office. In total, Suleski spent approximately 11 minutes inside the U.S. Capitol building.

---

[10] The Upper West Terrace Door is around the corner from the Senate Wing Door but was breached at 2:31 p.m., approximately 18 minutes after the Senate Wing Door breach, meaning Suleski entered the U.S. Capitol building about 19 minutes after Ashcraft but only two minutes after the breach of the Upper West Terrace Door.

Afterward, while still on the Capitol grounds, he gave an interview to a BBC reporter in which he celebrated the rioters' actions, including their violence. When interviewed by the FBI prior to his arrest, Suleski not only lied about the violence that he saw and about stealing papers from the building, he also actively concealed his cell phone from law enforcement officials, despite being presented with a search warrant for the phone. The United States recommended a sentence of 90 days' imprisonment, one year of supervised release, a $5,000 fine, $500 in restitution, and 60 hours of community service (the same recommendation as for Johnson). Judge Moss sentenced Suleski to 60 days' imprisonment but otherwise followed the government's recommendations.

Ashcraft's case is similar to Riddle's, Johnson's, and Suleski's in many ways: all four directly observed illegal actions by rioters but chose to enter the U.S. Capitol building anyway, all four entered through doors on the Upper West Terrace in the first few minutes after that particular door was breached, all four encouraged other rioters, all four roamed the Capitol building, all four stole items, and all four obstructed the investigation. Yet Ashcraft deserves a stiffer sentence than Johnson and Suleski (and a sentence at least equivalent to Riddle's) because his conduct was worse than theirs. Johnson committed a Section 641 (theft of government property) violation for converting the podium by carrying it from its proper location in the U.S. Capitol building to the Rotunda for his own use, but he did not take it out of the building, let alone destroy it.[11] Meanwhile, Riddle and Suleski stole less valuable and important items: a bottle of wine and a book (Riddle) and unidentified papers strewn on the floor outside a Congressional office (Suleski). In contrast, Ashcraft destroyed three different pieces of government property: (1) the white sheathing

---

[11] Johnson was charged with a violation of 18 U.S.C. § 641 (theft of government property) for the conversion of Speaker Pelosi's podium but his plea agreement did not include a plea to that offense.

surrounding the scaffolding; (2) the stolen American flag; and (3) the stolen flagpole. Additionally, Ashcraft's destruction of the white sheathing contributed to the revelation to the rioters of the stairs underneath that provided access to the Upper West Terrace, and eventually led to the breach of the building itself. It is possible that if rioters had never accessed those stairs, they might never have gained entry into the U.S. Capitol, and the story of January 6 would have been entirely different.[12] Finally, Ashcraft was among the very first wave of rioters to enter the U.S. Capitol building (he saw the windows adjacent to the Senate Wing Door being smashed and the door forced open) and spent 41 minutes inside the building; Riddle, Johnson, and Suleski breached the building later and spent less time inside (35 minutes for Johnson, 14 minutes for Riddle, and just 11 minutes for Suleski).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

---

[12] For example, the Secret Service only evacuated the Vice President, and Congress only recessed the Joint Session and evacuated its members, after rioters physically breached the building. While police officers would have still been outnumbered and endangered if the riot had been limited to the Capitol grounds and exterior, the country may not have suffered the constitutional crisis that it did.

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

**VI.     Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Ashcraft to 90 days in jail, 36 months of supervised release, $2,000 restitution, and the mandatory $50 special assessment. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

> Respectfully submitted,
>
> MATTHEW M. GRAVES
> United States Attorney
> D.C. Bar No. 481052

By:        */s/ Michael M. Gordon*
>           MICHAEL M. GORDON
>           Florida Bar No. 1026025
>           Assistant United States Attorney, Detailee
>           601 D St., NW
>           Washington, D.C. 20001
>           Tel. No. (813) 274-6370
>           michael.gordon3@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On February 28, 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

*/s/ Michael M. Gordon*
MICHAEL M. GORDON
Florida Bar No. 1026025
Assistant United States Attorney, Detailee
601 D St., NW
Washington, D.C. 20001
Tel. No. (813) 274-6370
michael.gordon3@usdoj.gov